**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1523

GAIL M. HUTTO; ELIZABETH W. HODGE; MARGARET B. LINEBERGER;
LYNN R. ROGERS; NANCY G. SULLIVAN; JANE P. TERWILLIGER;
JULIAN W. WALLS; DEBRA J. ANDREWS, and all others similarly
situated,

     Plaintiffs - Appellants,

  v.

THE SOUTH CAROLINA RETIREMENT SYSTEM; THE POLICE OFFICERS
RETIREMENT SYSTEM; THE SOUTH CAROLINA RETIREMENT SYSTEMS
GROUP TRUST; NIKKI R. HALEY, Governor of South Carolina, in
her official capacity as ex officio Chairwoman of the South
Carolina Budget and Control Board; CURTIS M. LOFTIS, JR.,
Treasurer of the State of South Carolina, in his official
capacity as an ex officio member of the South Carolina
Budget and Control Board; RICHARD ECKSTROM, Comptroller
General of the State of South Carolina, in his official
capacity as an ex officio member of the South Carolina
Budget and Control Board; HUGH K. LEATHERMAN, Chairman of
the South Carolina Senate Finance Committee, in his
official capacity as an ex officio member of the South
Carolina Budget and Control Board; W. BRIAN WHITE, Chairman
of the South Carolina House of Representatives Ways and
Means Committee, in his official capacity as an ex officio
member of the South Carolina Budget and Control Board;
MARCIA S. ADAMS, in her official capacity as Executive
Director of the South Carolina Budget and Control Board;
DAVID K. AVANT, in his official capacity as Executive
Director of the South Carolina Public Employee Benefit
Authority,

     Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Florence. J. Michelle Childs, District Judge. (4:10-cv-02018-JMC)

---

Argued: October 29, 2014          Decided: December 5, 2014

---

Before NIEMEYER, WYNN, and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wynn and Judge Thacker joined.

---

**ARGUED:** Richard Harpootlian, RICHARD A. HARPOOTLIAN, PA, Columbia, South Carolina, for Appellants. Tina Marie Cundari, SOWELL, GRAY, STEPP, & LAFFITTE, LLC, Columbia, South Carolina, for Appellees. **ON BRIEF:** Graham L. Newman, Christopher P. Kenney, RICHARD A. HARPOOTLIAN, PA, Columbia, South Carolina; James M. Griffin, Margaret N. Fox, LEWIS, BABCOCK & GRIFFIN, LLP, Columbia, South Carolina, for Appellants. Robert E. Stepp, SOWELL, GRAY, STEPP, & LAFFITTE, LLC, Columbia, South Carolina, for Appellees.

---

NIEMEYER, Circuit Judge:

South Carolina public employees commenced this class action challenging the constitutionality of the South Carolina State Retirement System Preservation and Investment Reform Act, 2005 S.C. Acts 1697 ("the 2005 Act"). That Act amended South Carolina's retirement laws by requiring public employees who retire and then return to work to make, beginning on July 1, 2005, the same contributions to state-created pension plans as pre-retirement employees but without receiving further pension benefits. The plaintiffs claimed that the 2005 Act effected a taking of their private property, in violation of the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. They named as defendants two state-created pension plans, in which they are participants; the South Carolina Retirement Systems Group Trust ("the Trust"), which holds the pension plans' assets; and state officials serving as trustees and administrators of the pension plans. For relief, they sought repayment of all contributions withheld since July 1, 2005, and injunctive relief prohibiting the future collection of such contributions.

Pursuant to the defendants' motion, the district court dismissed the complaint on the ground that all of the defendants are entitled to sovereign immunity.

We affirm, albeit on reasoning slightly different from that given by the district court. We conclude, as did the district court, that the pension plans and the Trust are arms of the State of South Carolina and therefore have sovereign immunity. Likewise, we conclude that the state officials sued in their official capacities for repayment of pension-plan contributions have sovereign immunity. Finally, we conclude that the state officials sued in their official capacities for prospective injunctive relief have sovereign immunity because their duties bear no relation to the collection of the public employees' contributions to the pension plans, precluding application of Ex parte Young, 209 U.S. 123 (1908). In reaching these conclusions, we reject the plaintiffs' argument that their claims under the Takings Clause of the Fifth Amendment are exempt from the protection of the Eleventh Amendment.

I

The plaintiffs are public employees and participants in two pension plans created by South Carolina in 1962 -- the South Carolina Retirement System and the South Carolina Police Officers Retirement System (collectively, "the Retirement System").[1] See S.C. Code Ann. §§ 9-1-20, 9-11-20(1). In their

---

[1] In all, South Carolina has created five pension plans for public employees, each referred to as a "Retirement System" --

4

complaint, they alleged that they and others similarly situated are "retired contributing members" of the Retirement System, who returned to work on or after July 1, 2005, when the 2005 Act went into effect, and who are, by reason of the 2005 Act, required "to contribute a portion of their gross earnings" to the Retirement System "without receiving any additional service credit or interest on their retirement accounts." Before July 1, 2005, retired participants could return to work for a salary of up to $50,000 without forfeiting the right to receive retirement benefits and without having to make further contributions to the Retirement System. See Ahrens v. State, 709 S.E.2d 54, 56-57 (S.C. 2011). But this changed with the enactment of the 2005 Act, and retired participants who return to work are now required to make the same contributions to the Retirement System as pre-retirement employees but without accruing additional service credit for pension benefits. See S.C. Code Ann. §§ 9-1-1790(C), 9-11-90(4)(c). The South Carolina General Assembly made the change to help fund the

---

the South Carolina Retirement System, the Retirement System for Judges and Solicitors of the State of South Carolina, the Retirement System for members of the General Assembly of the State of South Carolina, the National Guard Retirement System, and the South Carolina Police Officers Retirement System. S.C. Code Ann. §§ 9-1-20, 9-8-20, 9-9-20, 9-10-20(A), 9-11-20(1).

Retirement System and, in particular, to secure future cost-of-living adjustments.

The plaintiffs commenced this class action in August 2010 on behalf of themselves and all other participating employees who returned to work on or after July 1, 2005, alleging that, by enforcing the 2005 Act, the defendants "confiscated their private property," in violation of the Takings Clause of the Fifth Amendment and their procedural due process rights under the Fourteenth Amendment. In addition to naming as defendants the two pension plans, the plaintiffs named the Trust, which holds the assets of the Retirement System, and a number of state officials in their official capacities who, as members or executive directors of the State Budget and Control Board and the Public Employee Benefit Authority, serve as trustees and administrators of the Retirement System. The State Budget and Control Board and the Public Employee Benefit Authority are the statutorily designated co-trustees of the Retirement System. S.C. Code Ann. § 9-1-1310(A).

For relief, the plaintiffs sought (1) a declaratory judgment that the 2005 Act is unconstitutional; (2) an injunction against its enforcement; (3) an accounting of all contributions they made to the Retirement System since July 1, 2005; (4) an injunction compelling the return of all such

6

contributions; and (5) an order awarding them attorneys fees and costs.[2]

The Retirement System, the Trust, and the state officials filed a motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6), asserting numerous grounds for their motion, including sovereign immunity, claim and issue preclusion based on the prior state litigation, discretionary abstention, and failure to state a claim upon which relief can be granted. The district court granted the motion and dismissed the complaint, relying only on the defendants' sovereign immunity under the Eleventh Amendment.

---

[2] Before this action was commenced, public employees who retired and then returned to work before July 1, 2005, also commenced an action in state court, alleging that the 2005 Act breached a legislatively created contract with the "old working retirees" and violated the Takings Clause and the Due Process Clause of the U.S. Constitution. The South Carolina Supreme Court rejected the argument, holding that the "old working retiree statute [did] not create a binding contract between the State and the old working retirees," but the court did remand the case to the trial court "for a case by case factual determination of whether any actions of the State with regard to individual old working retirees constituted a breach of contract." Layman v. State, 630 S.E.2d 265, 271-72 (S.C. 2006). In 2011, the South Carolina Supreme Court affirmed the circuit court's conclusion that forms signed by the old working retirees, stating that they would not be required to pay into the pension plans, did not create a contract between the State and the old working retirees. Ahrens, 709 S.E.2d at 58-60. Because the employees' claims under the Takings Clause and the Due Process Clause were "founded on the presumption that a contractual right ha[d] been unfairly taken away," the court also affirmed the circuit court's grant of summary judgment on those claims. Id. at 63.

With respect to the institutional defendants, the court determined that "the Retirement Systems should be considered an arm of the State such that Eleventh Amendment immunity applies to bar [a federal] court from hearing the claim." Hutto v. S.C. Ret. Sys., 899 F. Supp. 2d 457, 473 (D.S.C. 2012). And "[b]ecause Plaintiffs seek monetary damages," it held that the claims against the individual defendants were similarly barred. Id. at 475 n.14. Having found that all of the defendants were immune by reason of sovereign immunity, the court declined to address the defendants' remaining grounds for seeking dismissal of the action.

The plaintiffs filed a motion for reconsideration under Rule 59(e), asserting that the district court erred in dismissing their claims for a declaratory judgment and injunctive relief against the state officials serving in their official capacities. They relied on Ex parte Young, 209 U.S. 123 (1908), which created an exception to Eleventh Amendment immunity with respect to claims for prospective injunctive relief to remedy ongoing violations of federal law. The district court denied the motion because, "in seeking to bar the enforcement of [the 2005 Act], which requires Plaintiffs to pay into the Retirement System, Plaintiffs' requested relief is undeniably monetary" and because an injunction ordering the

8

return of the contributions already withheld "would ultimately impact the State treasury."

This appeal followed.

II

The Eleventh Amendment shields a state entity from suit in federal court "if, in [the entity's] operations, the state is the real party in interest," in the sense that the "named party [is] the alter ego of the state." Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456, 457 (4th Cir. 1987).

The plaintiffs contend that the Retirement System and the Trust do not have the sovereign immunity afforded a State under the Eleventh Amendment because they are "non-state entit[ies]" and that the district court's contrary conclusion was based on an erroneous application of the factors articulated in Ram Ditta for determining whether an entity is an alter ego of the State. They argue, "[T]he District Court should have given effect to the express, unambiguous language of [South Carolina's retirement laws] and concluded that the Retirement Systems are independent corporate entities for which the State has no financial obligation as indemnitor."

The defendants contend that "State law makes the financial obligations of the state Retirement Systems obligations of the State"; that the State controls the Retirement System; that the

9

pension plans of the Retirement System "operate on a statewide basis and have statewide concerns"; and that South Carolina law treats the pension plans as state agencies. The defendants thus maintain that the Retirement System and the Trust are "arms of the State and [therefore] immune from suit."

Whether an action is barred by the Eleventh Amendment is a question of law that we review de novo. Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 222 (4th Cir. 2001).

At the outset, we address which party has the burden of proof when sovereign immunity under the Eleventh Amendment is raised. While the Supreme Court has described sovereign immunity as a "jurisdictional bar" that can be raised for the first time on appeal, Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 73 (1996), and "a constitutional limitation on the federal judicial power established in Art. III," Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984), it "ha[s] not decided" whether Eleventh Amendment immunity goes to a court's subject-matter jurisdiction, Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 391 (1998). Unlike subject-matter jurisdiction, which cannot be waived, a State can always waive its immunity and consent to be sued in federal court, Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985), and a court need not raise the issue on its own initiative, Wis. Dep't of Corr., 524 U.S. at 389. Because a defendant otherwise protected by the Eleventh

10

Amendment can waive its protection, it is, as a practical matter, structurally necessary to require the defendant to assert the immunity. We therefore conclude that sovereign immunity is akin to an affirmative defense, which the defendant bears the burden of demonstrating. In so concluding, we join every other court of appeals that has addressed the issue. See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 237-39 (2d Cir. 2006); Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 61 (1st Cir. 2003); Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir. 2002); Skelton v. Camp, 234 F.3d 292, 297 (5th Cir. 2000); Christy v. Pa. Turnpike Comm'n, 54 F.3d 1140, 1144 (3d Cir. 1995); Baxter v. Vigo Cnty. Sch. Corp., 26 F.3d 728, 734 n.5 (7th Cir. 1994), superseded by statute on other grounds as recognized in Holmes v. Marion Cnty. Office of Family & Children, 349 F.3d 914, 918-19 (7th Cir. 2003); ITSI TV Prods., Inc. v. Agric. Ass'ns, 3 F.3d 1289, 1292 (9th Cir. 1993).

In analyzing whether entities such as the Retirement System and the Trust are arms of the State, "the most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." Ram Ditta, 822 F.2d at 457. Thus, "if the State treasury will be called upon to pay a judgment against a governmental entity, then Eleventh

11

Amendment immunity applies to that entity." Cash, 242 F.3d at 223. If, on the other hand, the State treasury will not be liable for a judgment, sovereign immunity applies only where the "governmental entity is so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State treasury, amount to 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" Id. at 224 (quoting Seminole Tribe, 517 U.S. at 58). At bottom, even though "state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens, . . . the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns." Fed. Maritime Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 765 (2002) (internal quotation marks and citations omitted).

A

We address first the most important factor -- whether South Carolina could be responsible for the payment of a judgment against the Retirement System and the Trust. A State treasury is responsible "where the state is functionally liable, even if not legally liable." U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 137 (4th Cir. 2014) (quoting

12

<u>Stoner v. Santa Clara Cnty. Office of Educ.</u>, 502 F.3d 1116, 1122 (9th Cir. 2007)) (internal quotation marks omitted); <u>see also</u> <u>Ristow v. S.C. Ports Auth.</u>, 58 F.3d 1051, 1053 (4th Cir. 1995) (holding that courts must "[c]onsider[] <u>the practical effect</u> of a putative . . . judgment on the state treasury" (emphasis added)).

The plaintiffs argue that "the Retirement Systems Act insulates the state treasury from any judgment entered in this case" because it provides that "[a]ll agreements or contracts" with members" of the Retirement System are "solely obligations" of the individual pension plan and that "the full faith and credit" of South Carolina or its subdivisions "is not, and shall not be, pledged or obligated" beyond the State's contributions as an employer of participating employees. S.C. Code Ann. §§ 9-1-1690, 9-11-280.

This statutory language, however, must be read in the context of Article X, Section 16 of the South Carolina Constitution, which provides that "[t]he General Assembly shall annually appropriate funds and prescribe member contributions for any state-operated retirement system <u>which will insure the availability of funds to meet all normal and accrued liability of the system on a sound actuarial basis as determined by the governing body of the system</u>." S.C. Const. art. X, § 16 (emphasis added). Any possible ambiguity resulting from reading

13

the retirement laws in the context of the South Carolina Constitution was put to rest by the South Carolina Supreme Court in Wehle v. South Carolina Retirement System, 611 S.E.2d 240, 242-43 (S.C. 2005) (per curiam), where the Court stated that, "should the Board determine that any retirement system is not funded on a sound actuarial basis, the General Assembly must provide funding necessary to restore the fiscal integrity of the System." Thus, in the event that a judgment in this case were to render the Retirement System unable to meet its liabilities, the General Assembly would be obligated to account for any deficiency by increasing appropriations to the Retirement System or by requiring employers, including the State itself, to increase their contributions.

In addition, the State's ultimate responsibility for the financial soundness of the Retirement System is reflected by the fact that the Retirement System's "actuarial valuation is relied upon in the preparation of the State's annual financial statement and by outside entities in rating the State for purposes of issuance of bonds." Wehle, 611 S.E.2d at 242. Thus, if a judgment in this case were to render the Retirement System or the Trust insolvent, that insolvency would harm the State's credit rating, making it more expensive for the State to borrow money.

14

Consequently, we conclude that South Carolina remains functionally liable for any judgment against the Retirement System and the Trust, which is sufficient to make the Retirement System and the Trust arms of the State. See Oberg, 745 F.3d at 137.

We reject the plaintiffs' various arguments to the contrary. First, they insist that Article X, Section 16 of the South Carolina Constitution "merely compels the State to comply with its funding obligations as an employer," a requirement that the General Assembly could not have imposed on future legislatures by legislative act. And they complain that "the District Court unnecessarily construed the state Constitution in a manner that rendered it irreconcilable with Sections 9-1-1690 and 9-11-280." But the South Carolina Supreme Court, which, of course, has the last word on the meaning of the South Carolina Constitution, rejected the plaintiffs' posited construction of Article X, Section 16. See Wehle, 611 S.E.2d at 242-43. Moreover, the plaintiffs' argument that we must construe a constitutional provision so as not to conflict with a statute turns the concept of constitutional supremacy on its head.

Second, the plaintiffs maintain that there is no evidence that a judgment in their favor would in fact create a shortfall in the Retirement System's funds. Yet, given that the plaintiffs' complaint alleges that "the members of the proposed

15

class will exceed tens of thousands of persons," it is surely plausible that a favorable judgment could create an actuarial deficit. More importantly, whether or not a judgment would render the Retirement System insolvent is of little consequence to the analysis. As the Supreme Court held in <u>Regents of the University of California v. Doe</u>, 519 U.S. 425 (1997), "it is the entity's <u>potential</u> legal liability . . . that is relevant." <u>Id.</u> at 431 (emphasis added); <u>see also</u> <u>Owens v. Balt. City State's Att'ys Office</u>, 767 F.3d 379, 412 (4th Cir. 2014) ("When an entity has both state and local characteristics, 'the entity's <u>potential</u> legal liability' is relevant to the Eleventh Amendment inquiry" (emphasis added) (quoting <u>Regents</u>, 519 U.S. at 431)); <u>Oberg</u>, 745 F.3d at 137 ("[I]n assessing [the State treasury] factor, an entity's '<u>potential</u> legal liability' is key" (emphasis added) (quoting <u>Regents</u>, 519 U.S. at 431)). Consequently, "the proper inquiry is not whether the state treasury would be liable in <u>this</u> case, but whether, hypothetically speaking, the state treasury would be subject to 'potential legal liability' <u>if</u> the retirement system did not have the money to cover the judgment." <u>Ernst v. Rising</u>, 427 F.3d 351, 362 (6th Cir. 2005) (quoting <u>Regents</u>, 519 U.S. at 431)); <u>see also</u> <u>Pub. Sch. Ret. Sys. v. State St. Bank & Trust Co.</u>, 640 F.3d 821, 830 (8th Cir. 2011) (similar). Here, as in <u>Ernst</u>, the "plaintiffs fail to come to grips with the fiscal

16

reality that the State's funding requirement assuredly <u>could</u> increase if the retirement system were to use its current and future funding to pay off a judgment against it." 427 F.3d at 362 (emphasis added).

Third, the plaintiffs read much into the fact that the funds and assets of the Retirement System "are not funds of the State," S.C. Code Ann. § 9-1-1310(C), but instead are held "in a group trust under Section 401(a)(24) of the Internal Revenue Code," <u>id.</u> § 9-16-20(C). Section 401(a)(24) of the Internal Revenue Code requires that group trust funds not be "used for, or diverted to, purposes other than for the exclusive benefit of . . . employees or their beneficiaries in order to qualify as a group trust." 26 U.S.C. § 401(a)(24). While we have recognized that holding funds in a segregated account apart from general state funds does "counsel[] against establishing arm-of-the-state status," <u>Oberg</u>, 745 F.3d at 139, that fact is not dispositive. The plaintiffs also argue that South Carolina is violating § 401(a)(24) by diverting the contributions they made to the Retirement System to benefit pre-retirement employees. But even if South Carolina were indeed in violation of federal law by using funds contrary to § 401(a)(24), that fact would be irrelevant to whether a judgment against the Retirement System or the Trust could potentially affect the State treasury. <u>Accord</u> <u>Ernst</u>, 427 F.3d at 365.

17

Fourth, the plaintiffs argue that courts generally, and the district court in particular, should wait until the completion of discovery and the development of a factual record before resolving the sovereign immunity issue. But we have often affirmed Rule 12(b)(6) motions to dismiss on the basis of Eleventh Amendment immunity. See, e.g., Antrican v. Odom, 290 F.3d 178, 191 (4th Cir. 2002). In Gray v. Laws, 51 F.3d 426, 434 (4th Cir. 1995), upon which the plaintiffs rely for their argument, we vacated the district court's dismissal under the Eleventh Amendment not because the district court failed to conduct sufficient factfinding, but rather because the Supreme Court had changed the applicable Eleventh Amendment standard while the appeal was pending and "the barrenness of the record" rendered us ill-suited to apply the new standard.

Finally, the plaintiffs contend that we are bound by our earlier decision in Almond v. Boyles, 792 F.2d 451 (4th Cir. 1986). In Almond, we rejected, "for the reasons stated by the district court," a claim that the Eleventh Amendment barred a suit by a class of visually handicapped operators of vending stands to recover employer contributions to the North Carolina Teachers' and State Employees' Retirement System, which they claimed were collected in violation of federal law. Id. at 456. The district court had found that a judgment against the retirement system would not come from State funds for three

18

reasons, the "most important[]" of which was that "the defendants [had] not shown the court that the relief requested by the plaintiffs would inevitably lead to an additional appropriation of state funds." Almond v. Boyles, 612 F. Supp. 223, 228 (E.D.N.C. 1985) (emphasis added). But Almond's requirement that the defendants show that a judgment "would inevitably" be satisfied by the State is fundamentally at odds with Regents' subsequent less demanding standard of potential liability, and therefore Almond's framework is no longer applicable.

As the Supreme Court has framed the Eleventh Amendment inquiry, the question is whether, "[i]f the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No' -- both legally and practically -- then the Eleventh Amendment's core concern is not implicated." Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 51 (1994) (emphasis added). In light of Wehle's interpretation of Article X, Section 16, the answer to that question here is undoubtedly yes, and we therefore conclude that a judgment against the Retirement System and the Trust would implicate South Carolina's treasury.

B

In addition to South Carolina's potential funding obligation, we also conclude that state-dignity factors weigh in

19

favor of finding that the Retirement System and the Trust are arms of the State. See Fed. Maritime Comm'n, 535 U.S. at 765. When assessing whether allowing suit against a state entity would offend a State's dignity, we consider "(1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns -- whether local or statewide -- with which the entity is involved; and (3) the manner in which State law treats the entity." Cash, 242 F.3d at 224.

Under the degree-of-state-control factor, we consider "who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions," Oberg, 745 F.3d at 137 (quoting U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 580 (4th Cir. 2012)) (internal quotation marks omitted), as well as "whether an entity has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general," id. (citations omitted).

In this case, the Retirement System does have the "power and privileges of a corporation," S.C. Code. Ann. §§ 9-1-20, 9-11-20, including the powers to "sue and be sued," to "make contracts," and to buy and sell property, id. § 33-3-102. But, contrary to the plaintiffs' argument, the designation of an

20

entity as a corporation with the power to sue and be sued is not conclusive in establishing its autonomy. See Oberg, 745 F.3d at 139 (finding that the autonomy factor "cut both ways," even though the entity had the "power to enter into contracts, sue and be sued, and purchase and sell property in its own name"); see also State Highway Comm'n v. Utah Const. Co., 278 U.S. 194, 199 (1929) ("It is unnecessary for us to consider the effect of the general grant of power to sue or be sued . . . -- this suit, in effect, is against the state and must be so treated").

And other factors point to state control. The means by which the entities' officers are appointed suggest that the Retirement System is beholden to the State. The State Budget and Control Board and the Public Employee Benefit Authority, which are the co-trustees of the Retirement System, and the Retirement System Investment Commission, which has exclusive authority to invest the Trust's assets, see S.C. Code Ann. § 9-16-20(A), are comprised almost entirely of the Governor of South Carolina, the State Treasurer, the Comptroller General, the Chairman of the Senate Finance Committee, the Chairman of the House Ways and Means Committee, the President Pro Tempore of the Senate, the Speaker of the House of Representatives, and persons appointed by these officials. Id. §§ 1-11-10, 9-4-10(B)(1), 9-16-315(A). Although several of the appointees are required to be participants in the Retirement System, even those members are

21

selected by state officials. While the trustees and administrators of the Trust are, of course, required to discharge their fiduciary duties "solely in the interest of the retirement systems, participants, and beneficiaries," id. § 9-16-40, one would have to be naive to conclude that the State lacks any influence or control when it has the power of appointment. State control is further evidenced by the facts that: (1) the State Treasurer is the custodian of the Trust's funds and has sole authority to issue payments from the funds, id. §§ 9-1-1320, 9-11-250; (2) the Retirement System Investment Commission must provide quarterly reports to, among others, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, id. § 9-16-90(A); (3) the State must defend and indemnify the members of the Retirement System Investment Commission, id. § 9-16-370; and (4) an entire title of the Code of Laws of South Carolina is devoted to the extensive regulation of the Retirement System and the Trust.

In sum, because of the mixed indications as to control, we conclude that application of the control factor, if not favoring sovereign immunity, is inconclusive. Accord Oberg, 745 F.3d at 141 (finding that the control factor "present[ed] a close question" in light of the fact that the board of directors was largely composed of "state officials or gubernatorial appointees" but also "exercise[d] corporate powers including the

22

capacity to contract and sue and be sued"); Almond, 612 F. Supp. at 227 (holding that the control factor did "not weigh heavily in favor of either party," after noting the detailed statutory regime, the political nature of the appointment of the members of the board of trustees, the retirement system's corporate status, and the board's powers to sue and be sued and to buy and sell property).

Turning to the factor considering whether the entities' concerns are local or statewide, we conclude that this factor counsels in favor of sovereign immunity. In assessing this factor, courts must consider whether the entity has statewide or localized jurisdiction, Cash, 242 F.3d at 226, and "whether an entity's functions are 'classified as typically state or unquestionably local,'" Harter v. Vernon, 101 F.3d 334, 341 (4th Cir. 1996) (quoting Hess, 513 U.S. at 45). The Retirement System covers public employees throughout the State. And like "educating the [State's] youth," Md. Stadium Auth. v. Ellerbe Becket, Inc., 407 F.3d 255, 265 (4th Cir. 2005), providing for public employees -- many of whom work for the State -- upon retirement is an area of statewide concern. Accord Pub. Sch. Ret. Sys., 640 F.3d at 829 ("[T]he Retirement Systems do not furnish the type of local services that political subdivisions typically furnish, such as 'water service, flood control, [or] rubbish disposal'" (quoting Moor v. Cnty. of Alameda, 411 U.S.

23

693, 720 (1973))); Ernst, 427 F.3d at 361 ("[W]hen, as in this case, the retirement system is funded by annual appropriations from the state legislature, operates in part through the Michigan Treasury and in part through the State's Department of Management and Budget, operates on a statewide basis and serves . . . state-wide officials, it is fair to say that the retirement system performs a traditional state function"); McGinty v. New York, 251 F.3d 84, 98 (2d Cir. 2001) ("Although the Retirement System does not service state employees exclusively, it assists in the business of the state by enabling the state to meet its pension and benefits obligations . . .").

Finally, the factor assessing how South Carolina treats the entities points strongly in favor of sovereign immunity. This factor requires courts to consider "the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." Harter, 101 F.3d at 342. Title 9 of the Code of Laws of South Carolina repeatedly uses the term "State agency" to refer to the South Carolina Retirement System and the term "State agent" to refer to the Director of the Retirement System. S.C. Code Ann. §§ 9-3-20(4), 9-5-30(5) to -30(6). The Code also describes the South Carolina Public Employee Benefit Authority as "an administrative agency of state government." Id. § 9-4-10(H). Similarly, in Layman, the South Carolina Supreme Court

24

characterized the Retirement System as a "state agency" for purposes of S.C. Code Ann. § 15-77-300, which permits an award of attorneys fees to the prevailing party in an action brought by or against the State or any political subdivision thereof. 658 S.E.2d at 326. And in Ahrens, the Court analyzed whether, as an "agency," the Retirement System created a contract with the working retirees. 709 S.E.2d at 58-60. Indeed, South Carolina courts have frequently referred to the individual pension plans of the Retirement System as agencies. See, e.g., Kennedy v. S.C. Ret. Sys., 549 S.E.2d 243, 251 (S.C. 2001); S.C. Police Officers Ret. Sys. v. City of Spartanburg, 391 S.E.2d 239, 241 (S.C. 1990).

At bottom, we conclude that the relevant indicators strongly indicate that the Retirement System and the Trust are arms of the State of South Carolina and are therefore protected under the Eleventh Amendment. This conclusion is consistent with the holdings of the overwhelming number of federal courts that have held that similar retirement systems in other States are arms of the State. See Pub. Sch. Ret. Sys., 640 F.3d at 827–33; Ernst, 427 F.3d at 359–66; McGinty, 251 F.3d at 100; Mo. State Employees' Ret. Sys. v. Credit Suisse, N.Y. Branch, No. 09-4224-CV-C-NKL, 2010 WL 318652, at *6 (W.D. Mo. Jan. 21, 2010); N.M. ex rel. Nat'l Educ. Ass'n of N.M. v. Austin Capital Mgmt. Ltd., 671 F. Supp. 2d 1248, 1253 (D.N.M. 2009); Cal. Pub.

25

Emps. Ret. Sys. v. Moody's Corp., Nos. C 09-03628 SI, C 09-03629 JCS, 2009 WL 3809816, at *6 (N.D. Cal. Nov. 10, 2009); Turner v. Ind. Teachers' Ret. Fund, No. 1:07-cv-1637-DFH-JMS, 2008 WL 2324114, at *1 (S.D. Ind. June 5, 2008); Larsen v. State Employees' Ret. Sys., 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008); JMB Grp. Trust IV v. Pa. Mun. Ret. Sys., 986 F. Supp. 534, 538 (N.D. Ill. 1997); Sculthorpe v. Va. Ret. Sys., 952 F. Supp. 307, 309-10 (E.D. Va. 1997); Hair v. Tenn. Consol. Ret. Sys., 790 F. Supp. 1358, 1364 (M.D. Tenn. 1992); Mello v. Woodhouse, 755 F. Supp. 923, 930 (D. Nev. 1991); Reiger v. Kan. Pub. Emps. Ret. Sys., 755 F. Supp. 360, 361 (D. Kan. 1990); Retired Pub. Employees' Ass'n of Cal., Chapter 22 v. California, 614 F. Supp. 571, 573, 581 (N.D. Cal. 1984); United States v. South Carolina, 445 F. Supp. 1094, 1099-1100 (D.S.C. 1977); 21 Props., Inc. v. Romney, 360 F. Supp. 1322, 1326 (N.D. Tex. 1973).

III

Turning to the claims against the state officials, the plaintiffs alleged in their complaint that "[a]s a result of Defendants' deduction from [Plaintiffs'] earnings, Plaintiffs and the class have suffered and will continue to suffer irreparable and immediate harm and injury to their property and rights under the laws and Constitution of the United States." Accordingly, they requested, among other relief, injunctions

26

(1) "compelling Defendants to immediately return to Plaintiffs and the class all monies Defendants have deducted as contributions to the Retirement Systems since July 1, 2005," and (2) "preventing for all time enforcement of [the 2005 Act]." The plaintiffs contend that their requests for injunctive relief against the state officials are excepted from Eleventh Amendment protection under Ex parte Young.

First, we interpret the plaintiffs' request for an injunction compelling the return of "all monies Defendants have deducted as contributions to the Retirement Systems" as a claim for money damages. State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State. See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 609 n.10 (2001); Edelman v. Jordan, 415 U.S. 651 (1974); Martin v. Wood, ___ F.3d ___, No. 13-2283 (4th Cir. Nov. 18, 2014). Therefore, as did the district court, we hold that the plaintiffs' claim against the state officials for the return of their contributions is barred by the Eleventh Amendment.

Second, we agree with plaintiffs that their claim for the second injunction -- to prevent "for all time" the enforcement of the 2005 Act -- is prospective and seeks to remedy an ongoing violation of federal law. See Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002) ("In determining whether the

27

doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a "straightforward inquiry into whether [the] Complaint [1] alleges an ongoing violation of federal law and [2] seeks relief properly characterized as prospective'" (first alteration in original) (quoting Coeur d'Alene Tribe, 521 U.S. at 296 (O'Connor, J., concurring in part and concurring in the judgment))); see also Va. Office for Protection & Advocacy v. Stewart, 131 S. Ct. 1632, 1639 (2011); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 496 (4th Cir. 2005).

Nonetheless, for a reason supported by the record but not relied on by the district court, we conclude that the district court was also correct in dismissing the claim seeking the second injunction against state officials. See Greenhouse v. MCG Capital Corp., 392 F.3d 650, 660 (4th Cir. 2004) ("[W]e 'may affirm the dismissal by the district court upon the basis of any ground supported by the record even if it is not the basis relied upon by the district court'" (quoting Ostrzenski v. Seigel, 177 F.3d 245, 253 (4th Cir. 1999))).

The Ex parte Young exception to Eleventh Amendment immunity applies only where a party "defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional" has "some connection with the enforcement of the act." 209 U.S. at 157; see also S.C. Wildlife Fed'n v. Limehouse, 549 F.3d 324, 333

(4th Cir. 2008); Lytle v. Griffith, 240 F.3d 404, 410 (4th Cir. 2001).  Thus, we have held that a governor cannot be enjoined by virtue of his general duty to enforce the laws, Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001), and that an attorney general cannot be enjoined where he has no specific statutory authority to enforce the statute at issue, McBurney v. Cuccinelli, 616 F.3d 393, 400 (4th Cir. 2010).  In contrast, we have held that a circuit court clerk bore the requisite connection to the enforcement of state marriage laws to be enjoined from enforcing them, because the clerk was responsible for granting and denying applications for marriage licenses.  See Bostic v. Schaefer, 760 F.3d 352, 371 n.3 (4th Cir.), cert. denied, 135 S. Ct. 308 (2014).

The requirement that there be a relationship between the state officials sought to be enjoined and the enforcement of the state statute prevents parties from circumventing a State's Eleventh Amendment immunity.  See McBurney, 616 F.3d at 399; Lytle, 240 F.3d at 412 (Wilkinson, C.J., dissenting).  As the Court explained in Ex parte Young, if the "constitutionality of every act passed by the legislature could be tested by a suit against the governor and attorney general, based upon the theory that the former, as the executive of the State, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in

29

litigation involving the enforcement of its statutes," it would eviscerate "the fundamental principle that [States] cannot, without their assent, be brought into any court at the suit of private persons." 209 U.S. at 157 (quoting Fitts v. McGhee, 172 U.S. 516, 530 (1899)).

In this case, the plaintiffs named as defendants members of the State Budget and Control Board, the Executive Director of the State Budget and Control Board, and the Executive Director of the Public Employee Benefit Authority, seeking to enjoin them from deducting from the plaintiffs' paychecks the contributions mandated by the 2005 Act. The State Budget and Control Board and the Public Employee Benefit Authority serve as co-trustees of the Retirement System, S.C. Code Ann. § 9-1-1310, and South Carolina law vests "general administration and responsibility for the proper operation" of the Retirement System in the Public Employee Benefit Authority, id. §§ 9-1-210, 9-11-30. But neither the State Budget and Control Board nor the Public Employee Benefit Authority has responsibility for ensuring that employee contributions to the Retirement System be deducted from the employees' paychecks and transmitted to the Retirement System. Employers of covered employees are required to deduct the requisite contributions from the employees' paychecks and furnish the withheld amounts to the Retirement System, and any person who fails to remit withheld contributions to the

30

Retirement System is "guilty of a misdemeanor and must be punished by fine or imprisonment, or both." Id. § 9-11-210(7); see also id. § 9-1-1160(A). The Code of Laws of South Carolina nowhere gives the Retirement System, the Trust, or the trustees and administrators of the Retirement System the authority to deduct or refuse to deduct funds from participating employees' paychecks or to prosecute employers who violate their duties. Instead, the role of the state officials named in the complaint is merely to wait passively for the funds to be transmitted to the Retirement System and, once the funds have arrived, to manage and invest them. As such, the complaint seeks to enjoin the Retirement System's trustees and administrators from participating in a process in which they actually have no role.

Because the state officials named as defendants have no connection with the enforcement of the 2005 Act -- specifically S.C. Code Ann. § 9-1-1790(C) and § 9-11-90(4)(c) -- we hold that the Ex parte Young exception does not apply and that the state officials are thus entitled to Eleventh Amendment immunity on the claims seeking prospective injunctive relief.

IV

The plaintiffs contend that notwithstanding any Eleventh Amendment protection to which the defendants may be entitled, "sovereign immunity never bars a constitutional takings claim." They maintain that the Takings Clause provides an absolute

31

guarantee of just compensation when private property is taken for public use and argue that if the States were immune from takings claims in federal court, the Fifth Amendment would be "effectively abrogated" by the Eleventh Amendment.

It is true that under the Eleventh Amendment, States enjoy sovereign immunity except "where there has been 'a surrender of this immunity in the plan of the convention.'" Coeur d'Alene Tribe of Idaho, 521 U.S. at 267 (quoting Principality of Monaco v. Mississippi, 292 U.S. 313, 322-23 (1934)). But the Supreme Court has recognized that "the plan of the convention" or the States themselves have surrendered sovereign immunity in only six contexts: (1) when a State consents to suit; (2) when a case is brought by the United States or another State; (3) when Congress abrogates sovereign immunity pursuant to Section 5 of the Fourteenth Amendment or pursuant to the Bankruptcy Clause; (4) when a suit is brought against an entity that is not an arm of the State; (5) when a private party sues a state official in his official capacity to prevent an ongoing violation of federal law; and (6) when an individual sues a state official in his individual capacity for ultra vires conduct. See S.C. State Ports Auth. v. Fed. Maritime Comm'n, 243 F.3d 165, 176-77 (4th Cir. 2001), aff'd, 535 U.S. 743 (2002). The plaintiffs now invite us to recognize a seventh exception for claims brought under the Takings Clause of the Fifth Amendment.

32

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation," U.S. Const. amend. V, and the Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit . . . , commenced or prosecuted against one of the United States" by citizens of that State or another State, id. amend. XI. While there is arguably some tension between the protections of these amendments, that tension is not irreconcilable.

Just as the Constitution guarantees the payment of just compensation for a taking, so too does the Due Process Clause provide the right to a remedy for taxes collected in violation of federal law. See, e.g., McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, 496 U.S. 18, 51 (1990). But despite the constitutional requirement that there be a remedy, the Supreme Court expressly noted in Reich v. Collins, 513 U.S. 106 (1994), that "the sovereign immunity [that] States enjoy in federal court, under the Eleventh Amendment, does generally bar tax refund claims from being brought in that forum." Id. at 110 (second emphasis added). To ensure that taxpayers possess an avenue for relief, the Court held that state courts must hear suits to recover taxes unlawfully exacted, the "sovereign immunity [that] States traditionally enjoy in their own courts notwithstanding." Id.; cf. Alden v. Maine, 527 U.S. 706, 740

33

(1999) (holding that Congress cannot subject States to suits in state courts but taking care not to overrule Reich). Reasoning analogously, we conclude that the Eleventh Amendment bars Fifth Amendment taking claims against States in federal court when the State's courts remain open to adjudicate such claims.

South Carolina courts have long recognized a right of persons to sue the State for unconstitutional takings. See Graham v. Charleston Cnty. Sch. Bd., 204 S.E.2d 384, 386 (S.C. 1974) ("In this jurisdiction neither the State nor any of its political subdivisions is liable in an action ex delicto unless by express enactment of the General Assembly, except where the acts complained of, in effect, constitute a taking of private property for public use without just compensation" (emphasis added)), overruled on other grounds by McCall v. Batson, 329 S.E.2d 741 (S.C. 1985). Because the plaintiffs can have their takings claims heard in South Carolina state courts, the Eleventh Amendment does not render the Takings Clause an empty promise. But in concluding that the Fifth Amendment Takings Clause does not, in this case, trump the Eleventh Amendment, we do not decide the question whether a State can close its doors to a takings claim or the question whether the Eleventh Amendment would ban a takings claim in federal court if the State courts were to refuse to hear such a claim.

34

The plaintiffs direct our attention to numerous cases in which suits to recover property illegally seized by the government were held not to have been barred by sovereign immunity.  But in none of those cases did the plaintiffs sue either the sovereign itself or its alter ego.  For example, in United States v. Lee, 106 U.S. 196, 222 (1882), the Court permitted an ejectment action to proceed against federal officers who served as custodians of the estate of General Robert E. Lee because the suit was not against the United States.  In Tindal v. Wesley, 167 U.S. 204 (1897), the Court permitted a suit against two state officials to recover property wrongly held by them on behalf of the State, because the case was "a suit against individuals," id. at 221, and the Court could not perceive how it could "be regarded as one against the state," id. at 218.  And in Hopkins v. Clemson Agricultural College of South Carolina, 221 U.S. 636, 648-49 (1911), the Court permitted a suit alleging a takings claim to proceed against a university, but under the law in effect at the time, the fact that the university was set up as a corporation meant that it was not an arm of the State, see P.R. Ports Auth. v. Fed. Mar. Comm'n, 531 F.3d 868, 884 (D.C. Cir. 2008).  By contrast, in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689 (1949), the Court dismissed an action brought against the head of the War Assets Administration alleging that

35

he had refused to deliver coal that he had contracted to sell to the plaintiff and seeking an injunction prohibiting him from selling or delivering that coal to anyone else, because the relief sought was "against the sovereign." And while the Court has sometimes decided takings claims without considering Eleventh Amendment immunity, see, e.g., Brown v. Legal Found. of Wash., 538 U.S. 216 (2003); Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992), we cannot glean much from that fact given that a State can waive its Eleventh Amendment protection.

Finally, we note that every other court of appeals to have decided the question has held that the Takings Clause does not override the Eleventh Amendment. See Seven Up Pete Venture v. Schweitzer, 523 F.3d 948, 954 (9th Cir. 2008) ("[W]e conclude that the constitutionally grounded self-executing nature of the Takings Clause does not alter the conventional application of the Eleventh Amendment"); DLX, Inc. v. Kentucky, 381 F.3d 511, 526 (6th Cir. 2004) ("Treating DLX's claim as a self-executing reverse condemnation claim, . . . we conclude that the Eleventh Amendment's grant of immunity protects Kentucky from that claim . . ."); Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1279 (11th Cir. 1998) (holding that a takings claim was barred under the Eleventh Amendment, where state courts provided a means of redress for such claims); John G. & Marie Stella Kenedy Mem'l Found. v. Mauro, 21 F.3d 667, 674 (5th Cir. 1994) (holding that

the district court "correctly determined that the Foundation's Fifth Amendment inverse condemnation claim brought directly against the State of Texas" was barred by the Eleventh Amendment); Citadel Corp. v. P.R. Highway Auth., 695 F.2d 31, 33 n.4 (1st Cir. 1982) ("Even if the constitution is read to require compensation in an inverse condemnation case, the Eleventh Amendment should prevent a federal court from awarding it"); Garrett v. Illinois, 612 F.2d 1038, 1040 (7th Cir. 1980) ("Even though the Fifth Amendment alone may support a cause of action for damages against the United States, the Eleventh Amendment stands as an express bar to federal power when a similar action is brought against one of the states" (citation omitted)).

*   *   *

For the reasons given, the judgment of the district court is

AFFIRMED.